## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOLLY DOBROSKY,<br>　　　　　*Plaintiff,*<br><br>　　　　v.<br><br>JENNIFER LOMETTI, BUCKS COUNTY<br>CHILDREN & YOUTH SOCIAL SERVICES;<br>DETECTIVE PETER LANGE, LOWER<br>MAKEFIELD TOWNSHIP POLICE DEPT.; AND<br>WILLIAM R. MURPHY, BUCKS COUNTY<br>ASSISTANT DISTRICT ATTORNEY,<br>　　　　　*Defendants.* | :<br>:<br>:<br>:　**CIVIL ACTION NO.**<br>:<br>:　**JURY TRIAL DEMANDED**<br>:<br>:<br>:　**COMPLAINT**<br>:<br>:<br>:<br>:<br>: |

## I.　　**PRELIMINARY STATEMENT**

1.　　　On March 20, 2017, after a trial, plaintiff, Holly Dobrosky was wrongfully convicted of violating a custody order concerning her daughter.  Before, during, and after the proceeding, defendants fabricated evidence, presented false and perjured testimony, engaged in deliberate deception by suppressing material evidence, and denied Ms. Dobrosky due process of law and a fair trial, resulting in her malicious prosecution. Subsequently, plaintiff's conviction was reversed by the Pennsylvania Superior Court and that reversal was affirmed by the Pennsylvania Supreme Court.  On July 14, 2021, the Bucks County District Attorney's Office withdrew the entire prosecution.

　　　The defendants' sole purpose for orchestrating the sham trial was to conceal Ms. Dobrosky's valid contention that the child abuse allegations regarding her daughter were never properly investigated in accordance with Pennsylvania law.  If they had been, the allegations would have been "founded" and her daughter would have been protected from her abusive father.  As a result, plaintiff has suffered horrific damages – the most egregious being her inability to have contact with her daughter for the past seven years.

## II.     JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the Fourth and Fourteenth Amendments of the United States Constitution.  Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4), and the aforementioned statutory provisions.  Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to adjudicate state law claims.

3.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) in that all claims arose in this district.

## III.    PARTIES

4.      Plaintiff, Holly Dobrosky is a resident of the Eastern District of Pennsylvania and at all times relevant to this action resided in Bucks County, Pennsylvania with a current address of 800 Trenton Road, Langhorne, PA 19047.

5.      Defendant, Jennifer Lometti is and was, at all times relevant to this action, a social worker employed by the Bucks County Children & Youth Social Services Agency (BCC&YSSA), 2325 Heritage Center Drive, Building 500, Furlong, PA 18925. She is being sued in her individual and official capacity.

6.      Defendant, Detective Peter Lange is and was, at all times relevant to this action, a detective with the Lower Makefield Police Department, 1100 Edgewood Road, Yardley, PA 19067.  He is being sued in his individual and official capacity.

7.      Defendant, William R. Murphy was, at all times relevant to this action, an assistant district attorney with the Bucks County District Attorney's Office, 100 North Main Street, Doylestown, PA 18901.  He is being sued in his individual capacity.

8.     At all times relevant to this action, defendants acted under color of state law and in concert.

9.     At all times relevant to this action, the actions of defendants deprived the plaintiff of her constitutional and statutory rights.

## IV.     **FACTUAL ALLEGATIONS**

10.     In approximately late 2014, plaintiff, Holly Dobrosky's then 4-year-old daughter revealed to her longtime nanny, Glenda Hatton that her then husband and her child's father, Paul Biancheri ("Biancheri"), was sexually abusing her.

11.     Glenda Hatton revealed the child's disclosure to her daughter, Hope Renee Hatton, a Police Officer with the Lower Makefield Police Department.

12.     Subsequently, Glenda Hatton revealed the child's sexual abuse disclosure to plaintiff, Holly Dobrosky and conveyed that she requested her daughter, Hope Hatton to make the report based on Mrs. Hatton's fear of retaliation by Biancheri.

13.     At that time, plaintiff, Holly Dobrosky informed Glenda Hatton that she did not believe Biancheri was sexually abusing her child and initially requested that Mrs. Hatton not report any such abuse, but then later informed Mrs. Hatton she would not interfere with whatever action she deemed in the child's best interest, given the close bond Mrs. Hatton formed with her as the child's primary caretaker.

14.     On February 6, 2015, Hope Hatton made a report in Bucks County of the child's disclosure of sexual abuse by Biancheri to *her* mother, Glenda Hatton.

15.     Stefanie Mastrangelo of BCC&YSSA was assigned to investigate Hope Hatton's February 6, 2015 report of Biancheri's sexual abuse of the child.

16.     BCC&YSSA failed to implement a Safety Plan and take action to ensure the child's physical separation from Biancheri, her alleged perpetrator, during their

investigation – including the period of time before the child's Forensic Interview, even though at the time plaintiff, Holly Dobrosky and Biancheri were married and lived together with their daughter.

17.    On February 10, 2015, during a Forensic Interview, the child did not disclose Biancheri's sexual abuse, which was understandable given that he continued to maintain contact with her – even residing in the same house with her, likely resulting in her feeling too frightened and/or threatened, and not safe enough, to disclose his abuse.

18.    Stefanie Mastrangelo summarily dismissed Hope Hatton's February 6, 2015 abuse report against Biancheri, declaring it an "unfounded report," without even interviewing her or Glenda Hatton as mandated by the PA Child Protection Law.

19.    Subsequently, plaintiff, Holly Dobrosky, along with her daughter, continued to reside with Biancheri given Ms. Dobrosky's misplaced faith in BCC&YSSA and the child welfare process and her belief that if Biancheri was guilty of the suspected child abuse, BCC&YSSA would have discovered it, protected her daughter, and taken action to protect her child from future harm.

20.    Soon thereafter, the child began to exhibit disconcerting behavior, including pleading not be left alone with Biancheri, crying hysterically when left alone with him; soiling her underpants when forced to be with him; refusing to bathe; wearing layers of clothing; having frequent nightmares from when she awoke frightened, crying, and trembling; running from him when he came near her; refusing to kiss him goodnight – or at any other time during the day, referring to him as "the monster," and telling plaintiff, Holly Dobrosky and others with whom she came into contact with, including strangers, that she hated her daddy.

21.    On May 11, 2015, during the child's most alarming nightmare, she awoke literally trying to jump out of bed screaming "no, daddy, no."  She asked plaintiff, Holly Dobrosky if her daddy was really there or if she was just dreaming about him.  She revealed that in her dream, Biancheri was "poking" her privates.

22.    Subsequently, plaintiff, Holly Dobrosky arranged for her daughter to consult with Dr. Christine Smith, a psychologist at her pediatrician's office.  During the first visit with Dr. Smith, outside the child' presence, plaintiff revealed her sexual abuse disclosure to her nanny, Glenda Hatton, and described her increasingly disconcerting behavior leading plaintiff to suspect Biancheri may be sexually abusing her.  Dr. Smith explained that such suspicions were likely rooted in reality, and it may take her child a long time to disclose the abuse to anyone else, including Ms. Dobrosky, or even to her during therapy and explained she may never again disclose it to anyone else.

23.    On about their fourth therapy appointment, Dr. Smith explained to plaintiff, Holly Dobrosky that she must immediately discontinue her daughter's therapy because she was not experienced in, or qualified to treat child victims of sexual abuse, and directed that the child consult with an expert in the treatment of child sexual abuse victims and provided Ms. Dobrosky with her list of recommendations.

24.    On May 31, 2015, plaintiff, Holly Dobrosky separated from Biancheri after he struck her in the face during an argument, causing injuries which required her to seek medical treatment at St. Mary's Medical Center.

25.    On June 18, 2015, plaintiff, Holly Dobrosky and Biancheri's Divorce action was initiated.

26.     On July 9, 2015, plaintiff, Holly Dobrosky reached a formal, but amicable agreement with Biancheri to share 50/50 custody of the child, as memorialized in a July 30, 2015 Custody Order by Agreement.

27.     On November 1, 2015, plaintiff, Holly Dobrosky's daughter disclosed Biancheri's sexual abuse to plaintiff, and she immediately reported it to the police and filed a Petition for Protection from Abuse Order on the child's behalf.

28.     On November 2, 2015, the Honorable Robert Baldi granted the child's Petition for Protection from Abuse (PFA) and entered a temporary PFA Order prohibiting Biancheri from having contact with her.  Later that day, when plaintiff, Holly Dobrosky informed her daughter she would no longer be forced to have contact with Biancheri, she exclaimed, "mommy, you saved my life!"

29.     Defendant, Jennifer Lometti, was assigned to investigate plaintiff, Holly Dobrosky's aforesaid report of Biancheri's sexual abuse of then 5-year-old child.

30.     On November 4, 2015, defendant, Jennifer Lometti interviewed plaintiff, Holly Dobrosky who informed Ms. Lometti of the child's first disclosure of Biancheri's sexual abuse to Glenda Hatton that Hope Hatton reported on February 6, 2015; her recent November 1, 2015 disclosure to plaintiff; her fear and hatred of Biancheri; and her increasingly disconcerting behavior, including preoccupation at school with asking her kindergarten teacher, Sara Dietrich, if plaintiff or Biancheri would pick her up.

31.     Additionally, plaintiff, Holly Dobrosky informed defendant, Jennifer Lometti of Biancheri's cancellations of her daughter's therapy appointments with Dr. Christine Smith; Dr. Smith's opinion that Biancheri was sexually abusing the child; and Dr. Smith's recommendation for the child to seek treatment with a different therapist – one actually qualified and experienced in treating child sexual abuse victims.

32.     Plaintiff, Holly Dobrosky also informed defendant, Jennifer Lometti that her daughter underwent a SANE examination at CHOP.

33.     Further, plaintiff, Holly Dobrosky provided defendant, Jennifer Lometti with contact information for Hope Hatton, the first reporter of Biancheri's child abuse with significant knowledge thereof; Glenda Hatton; Carol Dobrosky, the child's maternal grandmother; and Jacquelyn Jastremski, the child's cousin – all in whom the child confided regarding Biancheri's sexual abuse.

34.     Additionally, plaintiff, Holly Dobrosky revealed what Glenda Hatton told her – that Glenda Hatton discussed with her therapist, Dr. Arathi Rao, the child's disclosure of Biancheri's sexual abuse, and that Dr. Rao herself unsuccessfully attempted to contact BCC&YSSA numerous times to discuss the child's abuse by Biancheri and inquire into their inexplicable failure to investigate the numerous reports of that abuse.

35.     Defendant, Jennifer Lometti informed plaintiff, Holly Dobrosky she would investigate Biancheri's abuse of her daughter but she would **not** implement a Safety Plan because she expected the judge assigned to her daughter's November 10, 2015 PFA hearing would extend the child's temporary PFA Order pending completion of her abuse investigation – because that is what normally occurs in such matters – but she would appear in court; the child was required to undergo a Forensic Interview; and she would speak with Dr. Smith and explain to her that as a mandatory reporter she was required by law to report Biancheri's sexual abuse of the child.

36.     On November 9, 2015, the child underwent a Forensic Interview.

37.     Immediately thereafter, defendant, Jennifer Lometti informed plaintiff, Holly Dobrosky that her daughter made a credible disclosure of Biancheri's sexual abuse. Ms. Lometti further stated she would commence an investigation into the abuse and

interview all individuals with knowledge of the child abuse.  Further, she would appear in court the following day to request an extension of the child's temporary PFA Order.

38.    On November 10, 2015, Bucks County Court of Common Pleas Judge James McMaster presided over the child's temporary PFA Order.

39.    Defendant, Jennifer Lometti failed to appear for the hearing.

40.    During the hearing, Sara Webster, Esquire, the child's lawyer, requested extension of the child's temporary PFA Order during the pendency of BCC&YSSA's investigation into Biancheri's abuse, explaining that the investigation had only commenced following the Forensic Interview, which only took place the day before.

41.    Additionally, Middletown Township Detective Andrew Amoroso testified that the BCC&YSSA investigation led by defendant, Jennifer Lometti was ongoing, and that Ms. Lometti did **not** implement a Safety Plan.

42.    Further, Biancheri's lawyer, Brian Coverdale, Esquire – a former Bucks County Assistant District Attorney – disingenuously argued that the child's temporary PFA Order should be vacated based on his false, unsubstantiated allegation that plaintiff, Holly Dobrosky fabricated her daughter's November 1, 2015 abuse report to somehow gain an advantage in her divorce action, but produced no evidence thereof, notably because *his* argument was fabricated and no such evidence existed.

43.    Judge McMaster vacated the child's temporary PFA Order, forcing her to resume contact with her abusive father before the BCC&YSSA investigation into his suspected abuse had barely commenced, let alone concluded.

44.    On November 10, 2015, after court, when plaintiff, Holly Dobrosky informed her daughter she must resume contact with Biancheri, the child made plaintiff

promise to fight for her and protect her "from daddy," and continue to fight for her – no matter what – until she never again had to have any contact with Biancheri.

45.     At the time of the November 10, 2015 hearing, defendant, Jennifer Lometti had yet to conduct the interview of Biancheri.  An interview of Biancheri was not conducted until two days later, on November 12, 2015 – and Ms. Lometti was absent.

46.     On November 17, 2015, plaintiff, Holly Dobrosky learned that on November 12, 2015 after Biancheri's interview, and only two days after her daughter made a credible disclosure of Biancheri's abuse during her Forensic Interview, defendant, Jennifer Lometti closed her investigation and declared the November 1, 2015 abuse report "unfounded" purportedly based on the absence of "corroborative evidence," notwithstanding the existence of available corroborative evidence.

47.     Subsequently, plaintiff, Holly Dobrosky repeatedly unsuccessfully implored defendant, Jennifer Lometti to ensure the safety and welfare of her daughter and investigate the numerous sexual abuse reports made on the child's behalf against Biancheri by various individuals, when she disclosed Biancheri's child abuse during her Forensic Interview and that disclosure was corroborated by individuals to whom defendant,  Lometti knew the child disclosed her father's sexual abuse.

48.     The purported investigation conducted by defendant, Jennifer Lometti did not comport with the manual that Pennsylvania's Department of Human Services provides to its social workers entitled ***Protective Services Investigation Decisions Handbook***, which requires that during an investigation into sexual abuse, the alleged perpetrator must not be permitted to have any access to the child.

49.     The manual contains a risk assessment tool that identifies, "factors which experience has shown to be associated with child abuse/neglect risk and severity."

50.     The manual identifies the following factors as creating a high risk of future abuse: when there is a history of previous sexual abuse suffered by the victim; when the original perpetrator is under sixteen years of age the victim is at high risk to be abused by the same perpetrator again; and when a previous abuser has constant access to the victim by living in the same home.

51.     The manual provides that: "[i]n cases involving sexual abuse, the factor of "Perpetrator Access to Child" would warrant major consideration, and "Complete Access to the Child" might be sufficient reason for the [social] worker to seek a protective custody arrangement for the child; or a court order removing the perpetrator from the home, even though most of the other factors may be at the low end of the risk continuum.

52.     Notwithstanding the clear mandates of DHS' manual for its social workers, defendant, Jennifer Lometti did not implement a Safety Plan preventing Biancheri's access to the child during the pendency of the BCC&YSSA investigation.

53.     The purported investigation conducted by defendant, Jennifer Lometti did not comply with Pennsylvania's Child Protective Services Law, specifically 55 Pa. Code §3490.55(d), which requires BCC&YSSA to conduct interviews of "those persons who are known to have or may reasonably be expected to have, information relating to the incident of suspected child abuse," including: (1) The child; (2) The child's parents or other person responsible for the child's welfare; (3) The alleged perpetrator of the suspected child abuse; (4) The reporter of the suspected child abuse; (5) Eyewitnesses to the suspected child abuse; and (6) Relatives who may have knowledge of the abuse.

54.     Notwithstanding the unequivocal mandates of 55 Pa. Code §3490.55(d), defendant, Jennifer Lometti failed to interview Biancheri – the perpetrator; Hope Hatton

– the reporter; and Glenda Hatton, Hope Hatton, Dr. Arathi Rao, Dr. Christine Smith, Carol Dobrosky, Jacquelyn Jastremski – individuals with knowledge of the child abuse.

55.     The investigation conducted by defendant, Jennifer Lometti did not comply with Pennsylvania's Child Protective Services Law (CPSL), specifically 55 Pa. Code §3490.55(g), which requires BCC&YSSA, "when investigating a report of suspected serious mental injury, sexual abuse or exploitation or serious physical neglect, the county agency shall obtain medical evidence or expert consultation, or both."

56.     Again, notwithstanding the unequivocal mandates of 55 Pa. Code §3490.55(g), defendant, Jennifer Lometti did not review the child's medical records from Lower Bucks Pediatrics, her pediatrician's office; Dr. Christine Smith, the psychologist at Lower Bucks Pediatrics with whom the child treated; and the Children's Hospital of Philadelphia, where she underwent a sexual abuse examination.

57.     Pennsylvania's CPSL imposes a duty on county agencies to investigate allegations of child abuse.  Further, DHS policy requires that county agencies "investigate every report of abuse regardless of previous unfounded reports."  It further requires assessment and implementation of a Safety Plan designed to protect the child during any such investigations.  Social workers investigating such abuse have a duty to be objective.  Where abuse reports are filed by parties involved in a custody dispute, social workers are encouraged to be even more thorough in their investigation.

58.     Defendant, Jennifer Lometti had a duty to ensure the safety of plaintiff's daughter and investigate Biancheri's sexual abuse of the child as mandated by the CPSL.

59.     If defendant, Jennifer Lometti actually investigated the child abuse reports in the manner prescribed by and consistent with DHS' Manual for its social workers and the CPSL, implemented a Safety Plan preventing Biancheri from having access to the

child, interviewed the individuals who possessed personal knowledge of the abuse, and reviewed relevant available medical records, she likely would have realized that the November 1, 2015 child abuse report, and prior February 6, 2015 report, lodged against Biancheri for sexual abuse of the child were indeed "founded" and that action was warranted to ensure ensured her safety and welfare by protecting her from Biancheri.

60.     Plaintiff, Holly Dobrosky contacted numerous child welfare protection agencies to discuss her daughter and BCC&YSSA's failure to investigate her child abuse by Biancheri.   Numerous child welfare agents with whom she spoke suggested that plaintiff create a video of the child detailing Biancheri's abuse and provide it to BCC&YSSA and law enforcement agents investigating the abuse.   Ms. Dobrosky reluctantly created a video wherein her daughter described Biancheri's sexual abuse.

61.     On December 17, 2015, plaintiff, Holly Dobrosky provided defendant, Jennifer Lometti; defendant, Peter Lange; and a Bucks County Assistant District Attorney with the video she recorded of her daughter detailing Biancheri's child abuse.   They reviewed it and summarily dismissed its probative value.

62.     Further, defendant, Peter Lange informed plaintiff, Holly Dobrosky that it was unlawful for her to keep possession of the video and instructed her to forward it to him and then delete it, which she did while he carefully watched.

63.     Beginning in approximately May of 2016, plaintiff, Holly Dobrosky's daughter's desperate pleas of "don't make me go with daddy" became more frequent, intense, and alarming and the child repeatedly begged her to save her from her daddy.

64.     Not knowing what else to do to help her daughter, plaintiff, Holly Dobrosky withheld custody from Biancheri while she continued her quest to ascertain

how she could protect her daughter from Biancheri and compel BCC&YSSA to conduct an adequate and proper investigation of Biancheri's abuse of the child.

65.     On July 2, 2016, defendant, Peter Lange prepared an Affidavit of Probable Cause in support of his Criminal Complaint against plaintiff, Holly Dobrosky for Interference with a Child Custody Order in violation of 18 Pa.C.S.A. §2904(a) which contained blatant fabrications recounting nonexistent conversations with plaintiff's father and brother.  Additionally, defendant, Peter Lange's Affidavit of Probable Cause failed to reference additional information, which was relevant and material to Biancheri's child abuse, as detailed below.

66.     On about July 5, 2016, plaintiff, Holly Dobrosky took her daughter to Miami to stay with Rebecca Morales and her family while she continued her search for a person or agency who could help  her child and continued to contact child welfare protection agencies who repeatedly advised her that only her local child welfare agencies – BCC&YSSA, PA Office of Children, Youth & Families, and PA DHS could assist her.

67.     Subsequently, plaintiff, Holly Dobrosky learned that Raheemah Shamsid-Deen Hampton, Director of the PA Office of Children, Youth and Families, would be returning from vacation around the first week in August.   Around that time, Ms. Dobrosky also learned that a warrant for her arrest had been issued in Bucks County for allegedly violating her child custody agreement.

68.     Plaintiff, Holly Dobrosky decided to return to Pennsylvania as soon as possible to attempt to obtain help for her daughter and address her outstanding arrest warrant.

69.     Prior to plaintiff, Holly Dobrosky's departure, she prepared and executed an Affidavit temporarily transferring parental rights of her daughter to Rebecca Morales for what she expected to be a brief absence from the child.

70.     In late July of 2016, plaintiff, Holly Dobrosky departed Miami and returned to Pennsylvania.  Plaintiff stayed in Philadelphia while she met with a criminal defense lawyer to make surrender arrangements on her outstanding arrest warrant and organized materials concerning BCC&YSSA's failure to investigate Biancheri's sexual abuse of her daughter in preparation for her expected telephone or in person conference with Ms. Hampton and any other child welfare agents.

71.     On July 25, 2016, the Honorable Robert Baldi issued an Order finding that plaintiff, Holly Dobrosky was in contempt of the July 30, 2015 Custody Order by Agreement and granted Biancheri sole legal and physical custody of the child.

72.     On or about August 1, 2016, and prior to plaintiff, Holly Dobrosky's arrest on August 2, 2016, United States Marshall Barry D. Golden of 400 North Miami, Avenue, 6th Floor, Miami, confirmed the child's location at Rebecca Morales' Miami residence but did not initiate contact with Mrs. Morales until *after* plaintiff was arrested and taken into custody, as he was instructed to do by Defendant, Detective Peter Lange.

73.     In fact, Marc Bourne, LPI, CCIP, a licensed Private Investigator with Know It All Intelligence Group was responsible for locating the child in Miami *prior* to plaintiff, Holly Dobrosky's August 2, 2016 arrest, thus obviating the need for anyone, including Defendant, Detective Peter Lange, to conduct any search for the child.

74.     On August 2, 2016, plaintiff, Holly Dobrosky was taken into custody and charged with Interference of a Child Custody Order.  Her bail was set at $1.0 million dollars, 10% to be posted and she was incarcerated pre-trial given her inability to pay it.

75.    On September 6, 2016, plaintiff, Holly Dobrosky's preliminary hearing was presented by defendant, William R. Murphy

76.    During the hearing, defendant, William R. Murphy failed to correct false testimony from his complaining witness, Biancheri who falsely testified that plaintiff was responsible for all the child abuse reports filed against him before and after November 1, 2015 – fabricated testimony.  Ms. Dobrosky was held for trial.

77.    By letter dated October 21, 2016, defendant, William R. Murphy forwarded to plaintiff, Holly Dobrosky's defense counsel, Bradley Bastedo, Esquire the Commonwealth's discovery production which included *only* police report summaries – not a single actual police report, witness statement, interview, investigation report, audio or video tape recording, medical record, forensic interview, forensic interview report, doctor's report, court order, phone record, or any other document was produced.

78.    Prior to trial, defendant, William R. Murphy did not forward any additional discovery to plaintiff, Holly Dobrosky's counsel, Bradley Bastedo, Esquire.

79.    Prior to and during plaintiff, Holly Dobrosky's trial, Bradley Bastedo, Esquire repeatedly informed her that defendant, William R. Murphy and other members of the Bucks County District Attorney's Office expressed their personal animus of Ms. Dobrosky – a former Philadelphia criminal defense lawyer and civil rights lawyer who practiced in Bucks County – referring to her as a "bitch."

80.    Bradley Bastedo, Esquire further informed plaintiff, Holly Dobrosky that his research revealed that hers was the only time the Bucks County District Attorney's Office prosecuted someone under 18 Pa.C.S.A. §2904(a).

81.     Defendant, William R. Murphy's prosecution of plaintiff, Holly Dobrosky for violating her July 30, 2015 Custody Order was duplicitous given Judge Baldi's July 25, 2016 Order finding her in Contempt of the July 30, 2015 Custody Order.

82.     On March 17, 2017, plaintiff, Holly Dobrosky's jury trial commenced before the Honorable Rea Boylan in the Bucks County Court of Common Pleas.

83.     Plaintiff, Holly Dobrosky's defense to the aforesaid charge was that she withheld custody to protect her child whom she believed was in danger from Biancheri, a complete defense pursuant to 18 Pa.C.S.A. §2904(b).

84.     Defendant, William R. Murphy prosecuted the case against plaintiff, Holly Dobrosky and presented the fabricated, false, and misleading testimony of Biancheri; defendant, Peter Lange; defendant, Jennifer Lometti; and Dr. Christine Smith in support of his false arguments that plaintiff was the only person who reported the abuse, she had ulterior motives for making the complaint, an investigation was conducted into her daughter's child abuse complaints, and the investigation revealed no evidence of abuse, therefore plaintiff had no basis to believe her daughter was in danger.

85.     Defendant, Peter Lange fabricated evidence when he testified that he contacted the PADB and an employer to ascertain plaintiff, Holly Dobrosky's most recent employer, and learned she was terminated.   However, defendant, William R. Murphy never produced any such materials and/or documents in his pre-trial discovery production or referred to them during her trial – likely because they did not exist and defendant, Lange fabricated them to portray Ms. Dobrosky in a negative light.

86.     Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lange was fabricated and intervened to correct the false testimony.  The discovery he produced contained no such evidence.

87.     Defendant, Peter Lange fabricated evidence when he testified that he spoke with Glenda Hatton when he was trying to locate plaintiff but failed to mention that Mrs. Hatton informed him that Ms. Dobrosky was withholding custody of her daughter to protect the child from Biancheri – her abusive father.

88.     Defendant, Peter Lange fabricated evidence when he testified that on July 6, 2016 he obtained a Ping Court Order authorizing him to track plaintiff's cell phone and spent the next few days analyzing the results of that Order, and then requested a Court Order and Search Warrant for phone records and received and analyzed those records – all in his supposed attempt to ascertain the child's location.  However, defendant, William R. Murphy never produced any such Orders, ping results, or telephone records in his pre-trial discovery production or referred to them during her trial – likely because they did not exist and defendant, Lange fabricated them.  In truth, Marc Bourne, and not defendant, Lange ascertained the child's location in Miami.

89.     Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lange was fabricated and intervened to correct the false testimony.  The discovery he produced contained no such evidence.

90.     Defendant, Peter Lange fabricated evidence when he testified that on August 2, 2016 he took a statement from plaintiff after she was arrested wherein she refused to provide her daughter's location – all in his supposed attempt to ascertain the child's location.  However, defendant, William R. Murphy never produced any such alleged statement in his pre-trial discovery or referred to them during her trial – likely because it did not exist, defendant, Lange fabricated it.  In truth, he did not need to ask plaintiff about the child's location because he was aware thereof prior to her arrest.

91.     Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lange was fabricated and intervened to correct the false testimony.  The discovery he produced contained no such evidence.  Moreover, an August 2, 2016 Police Report summary prepared by defendant, and produced by defendant, Murphy in discovery reveals his knowledge that federal agents confirmed the child's location prior to placing Ms. Dobrosky under arrest and taking her into custody.

92.     Moreover, in Pennsylvania, a criminal defendant's post-arrest silence is constitutionally protected and therefore defendant, William R. Murphy asked this question only out of reckless and/or malicious intent and to denigrate Ms. Dobrosky.

93.     Defendant, Peter Lange's false and fabricated testimony, purposefully, wrongfully, and improperly elicited by defendant, William R. Murphy portrayed plaintiff in a false, negative light, and diminished her concern of harm to her daughter based on the lack of investigation into the reported child abuse, the absence of which likely would have bolstered Ms. Dobrosky's credibility and procured a different jury verdict

94.     Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Detective Peter Lange was fabricated and intervened to correct the false testimony

95.     When defendant, William R. Murphy called defendant, Peter Lange as a rebuttal witness, he fabricated more evidence when he testified that in the video recorded by plaintiff which she produced on December 17, 2015 wherein her daughter describes and demonstrates her father's abuse, he falsely described the video stating the child was reluctant to describe the abuse when she uttered no such statement.  In truth, the video depicts the child's forthright description of Biancheri's abuse – likely would have bolstered Ms. Dobrosky's credibility and procured a different jury verdict.

96.    Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Detective Peter Lange was fabricated and intervened to correct the false testimony.  The aforesaid video is in his possession and does not depict what defendant, Lange falsely alleged.

97.    Defendant, William R. Murphy knew or should have known that the false and misleading testimony he elicited from Dr. Christine Smith regarding her qualifications to treat plaintiff's daughter, a sexual abuse victim, was fabricated because she had no such training or experience – likely explaining why defendant, Murphy failed to produce her curriculum vitae.

98.    Defendant, William R. Murphy knew or should have known that the false and misleading testimony he elicited from Dr. Christine Smith regarding whether plaintiff's daughter was a victim of sexual abuse when the child never disclosed it to her was fabricated because Dr. Smith and defendant, Murphy knew that a child's disclosure of abuse is not that simple and sometimes an abused child never disclosed.

99.    Defendant, William R. Murphy knew or should have known that the false and misleading testimony he elicited from Dr. Christine Smith regarding the reason plaintiff's daughter stopped treatment with her was not at the request of Biancheri when Dr. Smith stopped the treatment because she was not trained or qualified to do so.

100.    Defendant, Jennifer Lometti fabricated evidence when she falsely testified that she conducted an investigation into Biancheri's abuse of plaintiff's daughter when she did not.  Moreover, William R. Murphy never produced any evidence of such alleged investigation – likely because it did not exist, defendant, Lometti fabricated it, and lied about it to conceal the lack of her investigation.

101.    Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lometti was fabricated and intervened to correct the false testimony. The discovery he produced contained no such evidence.

102.    Defendant, Jennifer Lometti fabricated evidence when she falsely testified that during plaintiff's child's November 9, 2015 Forensic Interview, she did not make a credible disclosure of Biancheri's sexual abuse. Moreover, William R. Murphy never produced any evidence thereof – likely because it did not exist, defendant, Lometti fabricated it, and lied to conceal her lack of an investigation. Additionally, Detective Andrew Amoroso testified at plaintiff's trial that her daughter made a credible disclosure of abuse during her November 9, 2015 Forensic Interview which warranted investigation. He testified that therein, the child told the forensic interviewer that she "doesn't like daddy, doesn't like being with daddy. One time, he pushed my panties aside and touched my butt." He never impugned the child's credibility. Defendant, Lometti likely lied about it to conceal her failure to investigate Biancheri's child abuse.

103.    Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lometti was fabricated and intervened to correct the false testimony. The discovery he produced contained no such evidence.

104.    Defendant, Jennifer Lometti fabricated evidence when she falsely testified that during her purported investigation she interviewed Glenda Hatton, plaintiff's daughter's longtime nanny and the first person in whom the child confided concerning Biancheri's sexual abuse, when she did not. Moreover, William R. Murphy never produced any evidence of such an interview – likely because it did not exist, defendant, Lometti fabricated it, and lied to conceal her lack of an investigation.

105.    Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lometti concerning Glenda Hatton was fabricated and intervened to correct the false testimony.  The discovery he produced contained no such evidence.  Moreover, defendant, Murphy knew or should have known that defendant, Lometti testified in a prior court proceeding that the only interviews conducted were that of the child, Dobrosky and Biancheri.  Additionally, a November 16, 2015 Police Report further confirms this. ***See November 16, 2015 Police Report attached as Exhibit A.***

106.    Defendant, Jennifer Lometti fabricated evidence when she falsely testified that during her purported investigation she interviewed Hope Hatton, a former police officer and the first person who reported Biancheri's sexual abuse of plaintiff's daughter, when she did not.  Moreover, William R. Murphy never produced any evidence of such an interview – likely because it did not exist, defendant, Lometti fabricated it, and lied to conceal her lack of an investigation.

107.    Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lometti concerning Hope Hatton was fabricated and intervened to correct the false testimony.  The discovery he produced contained no such evidence.  Moreover, defendant, Murphy knew or should have known that defendant, Lometti testified in a prior court proceeding that the only interviews conducted were that of the child, Dobrosky and Biancheri.  Additionally, the aforesaid November 16, 2015 Police Report further confirms this.

108.    Defendant, Jennifer Lometti's fabricated evidence in the aforesaid paragraphs ***(See Jennifer Lometti's Trial Testimony attached as Exhibit B)*** constituted perjury – it contradicted her prior testimony given before the Honorable Robert Baldi on January 17, 2016, when she testified under oath that she did **NOT** interview Glenda

Hatton or Hope Hatton. ***See Jennifer Lometti's January 7, 2016 Court Testimony attached as Exhibit C.*** Further, defendant, William R. Murphy's solicitation thereof constituted prosecutorial misconduct.

109. Defendant, Jennifer Lometti fabricated evidence that plaintiff, Holly Dobrosky filed all the abuse reports against Biancheri when she did not. Ms. Dobrosky filed only a single report on November 1, 2015. Moreover, William R. Murphy never produced any evidence thereof – likely because it did not exist, defendant, Lometti fabricated it, and lied to conceal her lack of an investigation.

110. Defendant, William R. Murphy knew or should have known that 23 Pa. C.S.A. §6340(c) provides that the release of information "that would identify the person who made a report of suspected child abuse or who cooperated in a subsequent investigation is prohibited." "Law enforcement officials shall treat all reporting sources as confidential informants." Further, 23 Pa. C.S.A. §6349 provides that, "a person, including law enforcement official, who releases or permits the release of such confidential information commits a misdemeanor of the second degree. A person, including law enforcement official, who uses such confidential information "with intent to harass, embarrass or harm another person commits a misdemeanor of the first degree."

111. Defendant, William R. Murphy knew or should have known that applicable law prohibited him, subject to criminal penalties, from revealing the identity of any reports of child abuse. Moreover, defendant, Murphy knew or should have known that defendant, Lometti's aforesaid testimony concerning Hope Hatton was fabricated and intervened to correct the false testimony. The discovery he produced contained no such evidence. In fact, it proved that plaintiff made only a single report.

112.   Defendant, Jennifer Lometti fabricated evidence when she falsely testified that she did not conduct an interview of Carol Dobrosky in whom plaintiff's daughter confided concerning Biancheri's abuse because she was unaware of her identity. Defendant, Lometti had knowledge of all police reports made concerning this matter, including the one made by Carol Dobrosky.

113.   Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lometti concerning Carol Dobrosky was fabricated and intervened to correct the false testimony.  The discovery he produced contained a Police Report summary documenting the report made by Carol Dobrosky

114.   The truth – that plaintiff made only a single report of Biancheri's child abuse, defendant, Jennifer Lometti failed to properly investigate Biancheri's child abuse, and failed to interview Glenda Hatton, Hope Hatton, and Carol Dobrosky – would have destroyed defendant, Lometti's credibility, proven plaintiff's contention that her Biancheri's child abuse was never investigated, bolstered plaintiff's overall credibility but specifically her contention she withheld custody to protect her child from Biancheri, and likely procured a not guilty verdict

115.   Defendant, William R. Murphy knew or should have known that the aforesaid testimony of defendant, Lometti was fabricated and intervened to correct the false testimony.  The discovery he produced contained no such evidence.

116.   Defendant, William R. Murphy's entire closing argument was based on fabricated evidence, perjured testimony, and unsubstantiated conjecture.  Defendant, Murphy falsely claimed that plaintiff fabricated the abuse reports, using her daughter "as a pawn in this divorce."  He also falsely claimed, "[plaintiff] did what she did before to

try to get a leg up in the divorce, and it may have worked. But now she's trying to do it again."

117.    Defendant, William R. Murphy's aforesaid and additional arguments were based on fabricated evidence and tantamount to prosecutorial misconduct.

118.    Defendant, William R. Murphy also stated during his closing:

> Timing. Timing in this case is everything. Think about the Custody Order, the 48 hours on, 48 hours off. Well, if the defendant truly believed that this monster was doing these unspeakable things to her daughter, do you think she would have agreed to that Court Order…You can bet your ass ladies and gentlemen, if it was me and it was my child and somebody else was doing this to my kid, I wouldn't have given them 48 hours alone, no way. But the defendant did because she never believed it.

119.    Defendant, William R. Murphy's aforesaid argument was not based on facts adduced at trial. In fact, he produced and introduced into evidence the aforesaid Court Order which was executed five months before the child disclosed the abuse to her mother – the defendant. Further, Murphy presented no evidence that plaintiff's daughter lied about Biancheri's sexual abuse – indeed because none exists. Additionally, evidence presented at trial disproved this argument. Glenda Hatton, a defense witness, testified that the first sexual abuse report made on February 6, 2015 was made by her daughter, Hope Hatton; and at the time I negotiated that Custody Order plaintiff did not believe Biancheri was sexually abusing her daughter; and that Biancheri confronted Mrs. Hatton about making that first report. Moreover, Detective Andrew Amoroso, defendant, Murphy's own witness, who testified about the child's sexual abuse disclosure never accused her of lying. Further, this argument contradicted Murphy's own subsequent argument wherein he concedes that the child made "somewhat of a disclosure" of sexual abuse in November of 2015 but states, there's "no evidence whatsoever there was ongoing abuse."

120.    Defendant, William R. Murphy also argued:

You also heard [Biancheri], when did things really start going bad in the divorce, the timing.  January, right when the first complaints come out…… The timing is miraculous considering Glenda [Hatton} sat on this complaint for two and a half years and happened to time it at the time the defendant also filed her reports with Children and Youth.  That's a pretty big coincidence.  Also around the time the divorce really started to go south, another big coincidence.

121.    Defendant, William R. Murphy's aforesaid argument was not based on

facts adduced at trial.  In fact, it was based on facts contrary to those produced at trial.

Moreover, with this argument, defendant, Murphy concedes that it was **Glenda Hatton's**

**suspicions** (and not plaintiff's) that formed the February 6, 2015 sexual abuse report

made by Hope Hatton – contrary to the testimony he elicited from defendant, Lometti

that plaintiff filed all such reports.

122.    In addition, defendant, William R. Murphy argued:

You heard from Jennifer Lometti from Children and Youth, and **she talks fast, she was worried about testifying, but she got through it** (emphasis added). Jennifer is just one of many people over at Children and Youth that had involvement in this case as she said.  And they have a procedure, this is not just willy-nilly, I'll do this, I'll do that, its regimented, and you could probably understand why.  When you're dealing with children you have got to have rules, and every case works the same way, and it worked the same way all the time in this case.  From start to finish unfounded, not enough evidence…

123.    Again, defendant, William R. Murphy's aforesaid argument was not based

on facts adduced at trial.  In fact, it was based on facts contrary to those produced at trial.

Defendant, Jennifer Lometti – a prosecution witness – testified that someone else from

her office investigated the February 6, 2015 child abuse report but she was the only

person who purportedly investigated the November 1, 2015 child abuse report.

Defendant, Murphy again fabricated evidence in his closing that was not part of the trial

testimony – tantamount to prosecutorial misconduct.  Further, it is likely that defendant,

Lometti was worried about her testimony because she knew she was going to lie and commit perjury.

124.    As stated above, defendant, Lometti lied about her "actual" investigation. As the record in plaintiff's case clearly indicates, she did not conduct plaintiff's daughter's abuse investigation as mandated by Pennsylvania's Child Protective Services Law.    Further, she lied about the investigation and interviews she supposedly did conduct.  Defendant, Murphy was aware of this because he produced the discovery in this case which included no evidence of an actual investigation, including CPSL mandated interviews, other than those of plaintiff, her daughter, and Biancheri.

125.    In defendant, William R. Murphy's closing, he falsely accused Glenda Hatton, Jacquelyn Jastremski, and plaintiff of all lying about Biancheri's abuse of the child in the absence of a scintilla of evidence in support thereof – and therefore based his contention that the aforesaid witnesses all lied based solely on his own false, unsubstantiated improper personal opinions that they lied.

126.    Specifically, defendant, William R. Murphy falsely accused Glenda Hatton of lying, stating, "[Glenda Hatton's] got a bias.  She doesn't like [Biancheri.]"  He further falsely accused Mrs. Hatton of lying about her revealing plaintiff's daughter's abuse disclosures to her pastor, her therapist, and her daughter – again, in the absence of evidence thereof.  Indeed, his aforesaid argument was again a complete fabrication.

127.    Defendant, William R. Murphy also falsely accused plaintiff's daughter of lying, stating:

> Then jumping forward to the fall, November of '15, same thing, but this time there was a disclosure.  Now [Detective Amoroso] didn't go as far as to say it, but I will, someone put words in [the child's] mouth. **Do you know how I know that?  Because of what she said and how she said it** (emphasis added).  Do you remember when the defendant was testifying and that trashcan analogy.  Listen, I know [the child] is a wonderful little girl, and I know there are smart five-year-

olds out there, they are not going to say that about the trashcan at the front door, throw me out like the trash. They are not going to use those words that the defendant said [the child] used. Somebody was talking to her about this. It all was part of the plan to try to get a leg up.

128.    Defendant, William R. Murphy's aforesaid argument was again not based on facts adduced at trial.  In fact, Murphy presented no evidence that plaintiff's daughter lied about Biancheri's sexual abuse – indeed because none exists.  Moreover, Detective Amoroso, defendant, Murphy's own witness testified that the child made a credible disclosure of abuse and never accused her of lying.  Further, this argument contradicted defendant, Murphy's own subsequent wherein he concedes that the child made "somewhat of a disclosure" of sexual abuse in 2015 but there was "no evidence whatsoever there was ongoing abuse."

129.    Also in his closing, defendant, William R. Murphy reiterates Jacquelyn Jastremski's uncontradicted and unimpeached testimony concerning the child's sexual abuse disclosure to her but dismisses Ms. Jastremski's credibility, opining, "that's what happens when you give little girls baths."

130.    Additionally, defendant, William R. Murphy accused plaintiff of lying, stating that she lied because of her dislike for Biancheri, and she was somehow using her daughter "to get this divorce over with."  He further falsely opined, "[t]he defendant was taking those long pauses, almost like she was making it up as she went along when she was testifying."  Defendant, Murphy's aforesaid argument constituted improper opinion testimony and was not based on facts adduced at trial.  In fact, again, he presented no evidence that plaintiff lied about Biancheri's sexual abuse – indeed because none exists.

131.    Further, defendant, William R. Murphy referred to defendant, Detective Peter Lang as "Superman" for his supposed efforts on August 2, 2016 – after plaintiff's arrest – when he supposedly searched for and located the child when he produced not a

scintilla of evidence of Lange's purported search and rescue in discovery, notably because none exists as individuals other than defendant, Lang actually located the child.

132.    Lastly, defendant, William R. Murphy disingenuously argued that plaintiff subverted her own actions for those of the professionals who thoroughly investigated plaintiff's daughter's child abuse reports when in fact, there is no evidence that such investigation took place.   In so doing, he relies on defendant, Lometti's fabricated testimony of an alleged investigation and ignores the fact that Dr. Christine Smith was not a competent professional to testify as to what he elicited from her.

133.    In short, defendant, William R. Murphy's closing argument was based almost exclusively on fabricated evidence and his own baseless opinions – likely driven by his dislike of plaintiff and not the evidence relevant to the case.

134.    On March 20, 2017, plaintiff, Holly Dobrosky was found guilty.

135.    Immediately following the aforesaid verdict, defendant, William R. Murphy fabricated even more evidence when he falsely informed the court that in about the last week, plaintiff, Holly Dobrosky made an additional abuse report against Biancheri, but produced no evidence thereof.   Likely because she made no such report.

136.    Also on March 20, 2017, defendant, William R. Murphy requested and obtained from Judge Boylan a no-contact order precluding plaintiff, Holly Dobrosky's contact with Biancheri, as well as her daughter.

137.    On about March 22, 2017, plaintiff, Holly Dobrosky was released from custody with an ankle monitor and the requirement to report with probation/parole.

138.    On April 17, 2017, defendant, William R. Murphy filed a Motion to Revoke plaintiff, Holly Dobrosky's bail based on his fabrication of Ms. Dobrosky's alleged violation of Judge Boylan's aforementioned No-Contact wherein he asserted:

> The Defendant has failed to abide by her bail condition that she is not [sic] have no contact with the victims, Paul [Biancheri] and [the child]. Specifically, on Tuesday, February 11, 2017, the Defendant placed a collect call to Diana Collinelli. Ms. Collinelli is [the child's] nanny, and at the time of the call, was watching [the child] alone while Mr. Biancheri was working. Ms. Collinelli believes that the Defendant may have known she was alone with [the child] and that's why she placed the call at that specific time.

139.    Defendant, William R. Murphy knew that the assertions he made in the aforesaid April 17, 2017 Revocation Petition were fabricated when he possessed not a shred of evidence thereof, including any evidence available from his offices' investigator(s) assigned to the Bucks County Correctional Facility where and when plaintiff was incarcerated, such as a recording of the call or print-out of the call, and did not possess any evidence from Ms. Collinelli or her telephone provider evidencing the alleged February 11, 2017 call, such as a telephone bill, verified and/or notarized Affidavit from Ms. Collinelli or her sworn courtroom testimony relating thereto. In truth, defendant, William R. Murphy did not and could not produce any such evidence because the contact never occurred and was merely a fabrication maliciously designed to attack Ms. Dobrosky, falsely impugn her credibility, and suggest her unwillingness to comply with court orders thus warranting the imposition of some horrific sanction against her, such as being prohibited from contact with her daughter.

140.    On May 1, 2017, defendant, William R. Murphy filed a second Motion to Revoke plaintiff, Holly Dobrosky's bail based on his further fabrication of her second alleged violation of Judge Boylan's aforementioned No-Contact wherein he asserted:

> The Defendant has failed to abide by her bail condition that she is not [sic] have no contact with the victims, Paul [Biancheri] and [the child]. Specifically, on Tuesday, April 11, 2017, the Defendant placed a collect call to Diana Collinelli. Ms. Collinelli is [the child's] nanny, and at the time of the call, was watching [the child] alone while Mr. Biancheri was working. Ms. Collinelli believes that the

Defendant may have known she was alone with [the child] and that is why the Defendant chose that specific time to call.

141.   Defendant, William R. Murphy knew that the assertions he made in the aforesaid May 1, 2017 Revocation Petition were fabricated when he possessed not a shred of evidence thereof – such as documentary evidence from Ms. Collinelli or her telephone provider evidencing the call, a sworn Affidavit or other document executed by Ms. Collinelli, or even her sworn testimony relating thereto.  In truth, defendant, ADA William R. Murphy did not and could not produce any evidence of the aforesaid call because it never occurred and is merely a fabrication again maliciously manufactured to impugn Ms. Dobrosky's credibility and suggest her unwillingness to comply with court orders thus warranting the imposition of some horrific sanction against her, such as being prohibited from contact with her daughter.

142.   On June 19, 2017, defendant, William R. Murphy presented the fabricated and disparaging testimony of Paul Biancheri and his sisters, Maria Biancheri, and Elizabeth Smith, which he knew or should have known was fabricated.

143.   Specifically, defendant, William R. Murphy elicited false and slanderous testimony from Biancheri and his sisters which impugned the credibility of plaintiff, Holly Dobrosky, wherein they falsely alleged that she was a homicidal, suicidal, mentally ill drug addict who had been previously confined to a mental institution – in the absence of a shred of evidence thereof, and in spite of evidence produced by plaintiff which contradicted each of the aforesaid false and spiteful assertions, including numerous drug tests which proved no substance abuse and mental health evaluations which proved no mental disorders, and note her lack of any prior mental health treatment – in or out of a mental institution, and the substance of which defendant, William R. Murphy was aware

or should have been aware when he presented contradictory baseless fabricated testimony – again tantamount to prosecutorial misconduct.

144.     As a result, on June 19, 2017, Judge Boylan sentenced plaintiff, Holly Dobrosky to time served to twenty-three months with immediate parole and a consecutive five-year probation and issued an Order which precluded plaintiff from having contact with her daughter.

145.     On August 21, 2019, the Pennsylvania Superior Court reversed plaintiff, Holly Dobrosky's aforesaid conviction.

146.     On October 25, 2019, the Pennsylvania Superior Court denied the Commonwealth's request for reargument.

147.     On March 25, 2021, the Pennsylvania Supreme Court affirmed the aforesaid reversal.

148.     On July 14, 2021, the Bucks County District Attorney's Office withdrew its prosecution of plaintiff, Holly Dobrosky.

149.     Notwithstanding the aforesaid withdrawal and dismissal of plaintiff's prosecution, the Bucks County District Attorney's Office continues to force plaintiff to report to Bucks Probation and Parole. ***See Notices attached as Exhibit D.***

150.     Defendant, William R. Murphy knowingly introduced fabricated evidence from defendant, Jennifer Lometti, defendant, Dr. Christine Smith, and defendant, Detective Peter Lange.

151.     Defendant, William R. Murphy failed to intervene to correct the fabricated and false testimony from his witnesses and instead used the testimony in some twisted fashion, along with his own personal opinions, to make his own fabricated arguments to the jury in his closing.

152.   At all times relevant hereto, all defendants acted deliberately, intentionally, maliciously, outrageously, willfully, wantonly, for the purpose of violating plaintiff, Holly Dobrosky's constitutional and statutory rights, or with reckless disregard of her aforesaid rights, and constitutes conduct so egregious as to shock the conscience.

153.   As a direct and proximate result of the defendants' actions, plaintiff, Holly Dobrosky was wrongfully convicted, sentenced, placed on extended court supervision, wrongfully labeled a convicted felon, and precluded from contact with the daughter she continues to financially support.

154.   It further resulted in the denial of all her numerous Custody Petition, her inability to regain any custody of her daughter, including visitation or even supervised visitation.  Furthermore, it has provided Biancheri the opportunity to lie in their custody proceedings with impunity.  Not surprising, Biancheri is currently in violation of a recent Child Custody Order requiring him to take the child to reunification therapy with Ms. Dobrosky.

155.   Also as a result of the defendants' actions, plaintiff, Holly Dobrosky suffered and continues to suffer great mental anguish, extreme emotional distress, humiliation, damage to her reputation, and a loss of natural enjoyment of life and life's pleasures, some or all of which may be permanent.

156.   At no time relevant hereto could the defendants reasonably believe that their conduct toward plaintiff, Holly Dobrosky was lawful, privileged, or otherwise permissible under the laws or Constitutions of the United States and the Commonwealth of Pennsylvania, or that the laws regarding the rights of citizens such as plaintiff was in any way unsettled.

157.   The defendants' actions deprived plaintiff, Holly Dobrosky of her precious rights, privileges and immunities secured unto her by the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §1983.

158.   The aforesaid conduct of all defendants was committed alone, together, and in conspiracy with one another.

159.   The damages suffered by plaintiff, Holly Dobrosky were the direct and proximate result of the conduct of all defendants, jointly, severally, directly or vicariously.

### V.   COUNT ONE
### PLAINTIFF V. ALL DEFENDANTS
### CIVIL RIGHTS VIOLATIONS; FABRICATED EVIDENCE

160.   Plaintiff, Holly Dobrosky hereby incorporates the allegations set forth in the preceding paragraphs as though fully set forth.

161.   During plaintiff's trial, defendants, Jennifer Lometti and Peter Lang fabricated evidence and perjured themselves – misleading the court and the jury and causing Ms. Dobrosky to be maliciously prosecuted and wrongfully convicted.

162.   Before, during, and after plaintiff's trial, defendant, William R., Murphy fabricated evidence, elicited fabricated evidence from defendants, Jennifer Lometti and Peter Lang, as well as Paul Biancheri, Maria Biancheri, Elizabeth Smith, and Dr. Christine Smith, and elicited perjured testimony from defendants, Jennifer Lometti and Peter Lang – misleading the court and the jury and causing Ms. Dobrosky to be erroneously, wrongfully, and unlawfully convicted.

163.   The conduct of defendants' was wanton and willful, shocks the conscience, and justifies the imposition of treble damages.

164.    All defendants knew or should have known that their aforesaid conduct was wrong, inexcusable, unprotected, and criminally actionable.

165.    As a direct and proximate result of all defendant's actions, committed under color of state law, plaintiff, Holly Dobrosky was deprived of her rights under the Constitution of the United States, in particular, the Fourth and Fourteenth Amendments thereof and in violation of 42 U.S.C. §1983; the right to be free from malicious prosecution, the right to a fair trial, the right to a trial without fabricated evidence, the right to be secure in one's person and property, and the right to due process of law.

166.    All defendants, alone and/or with others, conspired to violate and/or did violate the constitutional rights of plaintiff, Holly Dobrosky.

167.    As a direct and proximate result of the defendants' actions, plaintiff, Holly Dobrosky sustained the aforesaid damages, and continues to suffer harm.

**WHEREFORE**,  plaintiff,  Holly  Dobrosky  demands  judgment  against  all defendants, jointly and severally, in an amount in excess of one hundred million dollars, plus interest, costs, punitive damages, attorneys' fees and such other and further relief as this Honorable Court deems appropriate.

### VI.    COUNT TWO
### PLAINTIFF V. ALL DEFENDANTS
### MALICIOUS PROSECUTION

168.    Plaintiff, Holly Dobrosky hereby incorporates the allegations set forth in the preceding paragraphs as though fully set forth.

169.    During plaintiff's trial, defendants, Jennifer Lometti and Peter Lang fabricated evidence and perjured themselves – misleading the court and the jury and causing Ms. Dobrosky to be maliciously prosecuted and wrongfully convicted.

170.    Before, during and after plaintiff's trial, defendant, William R., Murphy fabricated evidence, elicited fabricated evidence from defendants, Jennifer Lometti and Peter Lang, as well as Paul Biancheri, Maria Biancheri, Elizabeth Smith, and Dr. Christine Smith, and elicited perjured testimony from defendants, Jennifer Lometti and Peter Lang – misleading the court and the jury and causing Ms. Dobrosky to be erroneously, wrongfully, and unlawfully convicted.

171.    The conduct of defendants' was wanton and willful, shocks the conscience, and justifies the imposition of treble damages.

172.    All defendants knew or should have known that their aforesaid conduct was wrong, inexcusable, unprotected, and criminally actionable.

173.    The actions of the aforesaid defendants, as alleged in the preceding paragraphs, were done purposefully with the intent of committing malicious prosecution and malicious abuse of process of law, or were done in reckless disregard of the probability of causing malicious prosecution, and these actions did in fact result in malicious prosecution, all to plaintiff's great detriment and loss.

174.    All defendants, alone and/or with others, conspired to violate and/or did violate the right of plaintiff, Holly Dobrosky to be free from malicious prosecution.

175.    As a direct and proximate result of the defendants' actions, plaintiff, Holly Dobrosky sustained the aforesaid damages, and continues to suffer harm.

**WHEREFORE**, plaintiff, Holly Dobrosky demands judgment against all defendants, jointly and severally, in an amount in excess of one hundred million dollars, plus interest, costs, punitive damages, attorneys' fees and such other and further relief as this Honorable Court deems appropriate.

## VII.   COUNT THREE
## PLAINTIFF V. ALL DEFENDANTS
## CIVIL CONSPIRACY

176.   Plaintiff, Holly Dobrosky hereby incorporates the allegations set forth in the preceding paragraphs as though fully set forth.

177.   The defendants' conduct as detailed above was at the least reckless and at most intentionally illegal, as well as wanton and willful, shocks the conscience, and justifies the imposition of treble damages.

178.   All defendants knew or should have known that their aforesaid conduct was wrong, inexcusable, unprotected, and criminally actionable.

179.   At all times relevant hereto, all defendants, alone and/or with others, conspired to violate and/or did violate the right of plaintiff, Holly Dobrosky to be free from civil rights violations and malicious prosecution.

180.   As a direct and proximate result of the defendants' actions, plaintiff, Holly Dobrosky sustained the aforesaid damages, and continues to suffer harm.

**WHEREFORE**, plaintiff, Holly Dobrosky demands judgment against all defendants, jointly and severally, in an amount in excess of one hundred million dollars, plus interest, costs, punitive damages, attorneys' fees and such other and further relief as this Honorable Court deems appropriate.

Dated: July 10, 2023

Holly Dobrosky, *Pro Se*
800 Trenton Road, Apt. 229
Langhorne, PA 19047
hdobrosky17@gmail.com
Telephone: 267-570-6980

## VIII.    JURY TRIAL DEMAND

Plaintiff, Holly Dobrosky demands a trial by jury as to each count.


## IX.    PRAYER FOR RELIEF

Plaintiff, Holly Dobrosky requests the following relief, as to each cause, count,

and defendant:

     a)     compensatory damages in excess of $100 million dollars;

     b)     punitive damages;

     c)     reasonable attorneys' fees and costs; and

     d)     such further relief as the Court shall deem just and proper.


Dated: July 10, 2023

Holly Dobrosky, *Pro Se*
800 Trenton Road, Apt. 229
Langhorne, PA 19047
hdobrosky17@gmail.com
Telephone: 267-570-6980

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _800 Trenton Rd, Apt 229, Langhorne PA 19047_

Address of Defendant: _2325 Heritage Center Drive, Building 500 Furlong PA 18925_

Place of Accident, Incident or Transaction: _Bucks County_
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))            Yes☐  No☑

Does this case involve multidistrict litigation possibilities?            Yes☐  No☑

*RELATED CASE, IF ANY:*

Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐  No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☐  No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐  No☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐  No☐

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, _Plaintiff, Holly Dobrosky_, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _7/10/2023_        _Holly Dobrosky_        X _____
                         Attorney-at-Law  Plaintiff        Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _7/10/2023_        _Holly Dobrosky_        X _____
                         Attorney-at-Law  Plaintiff        Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

HOLLY DOBROSKY

v.

JENNIFER LOMETTI, ETAL.

:
:
:
:
:
:

CIVIL ACTION

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)   In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                  ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (☒)

7/10/23
_____     _____          _____
**Date**                **Attorney-at-law**            ~~Attorney for~~ Pro se, plaintiff

267-570-6980            _____          hdobrosky17@gmail.com
_____
**Telephone**            **FAX Number**                 **E-Mail Address**

(Civ. 660) 10/02

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HOLLY DOBROSKY

**DEFENDANTS**

JENNIFER LOMETTI, ET. AL

**(b)** County of Residence of First Listed Plaintiff    BUCKS
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    BUCKS
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
Plaintiff
- ☒ 3   Federal Question
*(U.S. Government Not a Party)*
- ☐ 2   U.S. Government
Defendant
- ☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC §§ 1983 and 1988

Brief description of cause:
Malicious Prosecution -Civil Rights

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 100 Million

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE   7/10/23

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____